# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

№ 04-CV-0210 (JFB) (RML)

———————————

JIN ZHAO,

Plaintiff,

VERSUS

STATE UNIVERSITY OF NEW YORK, RESEARCH FOUNDATION OF THE STATE UNIVERSITY OF NEW YORK, AND DR. OLCAY BATUMAN,

Defendants.

———————————

MEMORANDUM AND ORDER
January 8, 2007

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Dr. Jin Zhao ("Dr. Zhao") brings this action alleging employment discrimination on the basis of her national origin and a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.*, ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the New York State Human Rights Law, Executive Law § 269 *et seq.* ("NYSHRL"), against defendants State University of New York ("SUNY"), SUNY Downstate Medical Center, the Research Foundation of SUNY, and Dr. Olcay Batuman ("Dr. Batman"). In addition, plaintiff alleges breach of employment contract against the Research Foundation of SUNY and Dr. Batuman.[1]

Defendants now move for summary judgment on all claims, pursuant to Fed. R. Civ. P. 56(c). For the following reasons, Dr. Batuman's motion for summary judgment as to the Title VII and breach of contract claims is granted and her motion as to the NYSHRL

———————————

[1] Plaintiff's complaint also named the Health Science Center at Brooklyn Foundation, Inc. ("the Health Science Center") as a defendant. However, on November 5, 2004, the case against the Health Science Center was dismissed pursuant to a stipulation. In addition, counsel for plaintiff also withdrew the following claims: (1) the retaliation claim; and (2) the state claims against SUNY for breach of contract and violation of the NYSHRL. (Transcript of August 11, 2006 Oral Argument, at 5.)

claim is denied. The motions by defendants SUNY and the Research Foundation are denied in their entirety.

## I. BACKGROUND

### A. THE FACTS

#### 1. The Parties

SUNY is a state-created public university system established under the Education Law of the State of New York. (Defs.' Joint Rule 56.1 Statement ("Defs.' 56.1") ¶ 1.)[2] SUNY Downstate Medical Center ("SUNY DMC") is a state university healthcare facility established as a part of SUNY under the Education Law of the State of New York.[3] (*Id.* ¶ 2.)

The Research Foundation of SUNY ("the Research Foundation") is a private, nonprofit corporation established by the New York State Board of Regents, pursuant to Section 216 of the Education Law of the State of New York, and is a corporate entity separate from SUNY. (*Id.* ¶¶ 4-5.) The mission of the Research Foundation since its inception in 1951 has been to administer research grants awarded to SUNY and its faculty, and to

provide other services in support of the research, instruction and public service missions of SUNY. (Declaration of James R. Dennehey ¶¶ 4-5.)

Dr. Batuman is an Associate Professor of Medicine and an Associate Professor of Anatomy and Cell Biology at SUNY DMC, and has held those positions since 1992 and 1997, respectively. (Defs.' 56.1 ¶ 3.) The primary focus of Dr. Batuman's scientific research since joining SUNY DMC has been to understand the role of blood vessel cells, also known as endothelial cells, in various blood cancers, including the form of blood cancer known as multiple myeloma. (*Id.* ¶ 9.)

Plaintiff Dr. Jin Zhao is a woman of Chinese national origin, who was employed as a post-doctoral associate in a scientific research laboratory run by Dr. Batuman at SUNY DMC, from January 14, 2002, until she received a formal termination letter from Dr. Batuman on October 25, 2002. (*Id.* ¶ 6.)

#### 2. Dr. Batuman's Laboratory

In connection with her role as an academic physician-scientist, Dr. Batuman operates a research laboratory located at SUNY DMC. (*Id.* ¶ 14.) Funding for the research conducted in Dr. Batuman's laboratory is provided through grants obtained from public and private health institutions, such as the National Institute of Health, the Veterans Administration, the American Cancer Society, the American Heart Association, the American Lung Association (Brooklyn Chapter), the Multiple Myeloma Research Foundation, and through grants provided by private pharmaceutical companies. (*Id.* ¶ 15.) Grants for Dr. Batuman's laboratory are obtained through a competitive application process pursuant to which Dr. Batuman, as the

---

[2] Where only one party's 56.1 Statement is cited, the facts are taken from that party's 56.1 Statement, and the other party does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

[3] Because SUNY Downstate Medical Center is a State university health care facility established under New York law as a part of SUNY, *see* N.Y. Educ. Law §§ 350(5), 352(1), 352(3), the only proper institutional State defendant in this action is SUNY. Accordingly, the caption shall be amended to eliminate SUNY Downstate Medical Center as a separate defendant.

principal investigator on a proposed research project, submits a grant proposal in the appropriate form to one of the public or private institutions from which funding for such projects is available. (*Id.* ¶ 16.) The operation of Dr. Batuman's laboratory is strictly dependent on the receipt of funds from such grants, and the production of publishable research by the laboratory is essential to obtaining new grants, as well as extensions or renewals of existing grants. (*Id.* ¶ 17.)

Applications for the grants are made through the Research Foundation, which holds and administers the funds that scientists at SUNY campuses obtain from sources other than SUNY to conduct their research activities (hereinafter, "extra-mural funding"). (*Id.* ¶¶ 18-19.) At Dr. Batuman's request, and pursuant to prescribed procedures, the Research Foundation disburses funds and makes payments for expenses related to the research for which Dr. Batuman has obtained extra-mural funding. (*Id.* ¶ 20.)

Part of Dr. Batuman's role as a member of the faculty at SUNY DMC is to provide research training for medical students, graduate and undergraduate students, and post-graduate clinical residents. (*Id.* ¶ 21.) Therefore, at any one time, one or more of these types of research trainees may be participating in ongoing research in Dr. Batuman's laboratory. (*Id.* ¶ 22.) The funds that Dr. Batuman obtains from grants, as administered by the Research Foundation, may be used to pay salaries for post-graduate research fellows or associates, technicians, or other individuals, for their assistance with the laboratory's research. (*Id.* ¶ 25.) When Dr. Batuman hires an individual to work full-time in the laboratory using funds she has obtained from grants administered by the Research Foundation, the individual's employment is administered by the Research Foundation. (*Id.* ¶ 26.) The individual's salary and benefits are provided by the Research Foundation and, prior to commencing work, the individual is required to provide the Research Foundation with written acknowledgment that his or her employment is at-will and governed by the Research Foundation's policies. (*Id.* ¶ 27.)

From August 2000 to August 2001, Dr. Hong Zhang, a woman of Chinese national origin, was employed in Dr. Batuman's laboratory as a post-doctoral associate to assist with the laboratory's research. (*Id.* ¶ 28.) During the spring of 2001, while Dr. Zhang was working in Dr. Batuman's laboratory, she participated in initial research in the lab concerning a relationship between endothelial cells and multiple myeloma. (*Id.* ¶ 31.) In connection with this initial research, Dr. Zhang utilized a process known as flow cytometry to identify and quantify endothelial cells in patient blood samples. (*Id.* ¶ 32.) The findings that resulted from Dr. Zhang's flow cytometry work and other research work in Dr. Batuman's lab in 2001 led Dr. Batuman to make a grant application to the Multiple Myeloma Research Foundation for a Senior Research Award of $100,000 to study the relationship between endothelial cells and the development of mutliple myeloma ("MMRF Research"). (*Id.* ¶ 34.) That grant application was approved in or around October 2001. (*Id.* ¶ 35.) Before receiving notice of the grant approval, Dr. Zhang accepted a higher paying position in the Department of Surgery at SUNY DMC. (*Id.* ¶ 36.)

### 3. Hiring of Dr. Zhao

After Dr. Zhang left Dr. Batuman's laboratory, Dr. Batuman placed an advertisement in the October 2001 issue of *Science*, seeking post-doctoral associates to assist in the MMRF research and other ongoing research in her lab. (*Id.* ¶ 39.) Dr. Zhao responded to the advertisement by sending a copy of her resume and, on or about November 6, 2001, Dr. Zhao appeared for an interview at Dr. Batuman's request for one of the advertised positions. (*Id.* ¶¶ 40-43.) During the interview, Dr. Batuman broadly explained to Dr. Zhao the research that she was conducting and intended to conduct in her laboratory. (*Id.* ¶ 44.) At Dr. Batuman's request, plaintiff was interviewed for a second time on or about November 22, 2001. (*Id.* ¶ 47.)

According to Dr. Zhao, at the interviews, she was given the impression from Dr. Batuman's statements that she admired Chinese people because of their capacity to work, that Chinese people had been employed by her in the past and she admired their work ethic, and that she was impressed by the recommendation letter from a doctor which mentioned that on one occasion Dr. Zhao had "slept in the lab" to ensure the proper time course for an experiment. (Zhao Decl. ¶¶ 8-9.) For example, Dr. Zhao testified that, during the interview, Dr. Batuman stated, "I know Chinese students work very hard, long, so I like to employ Chinese." (Zhao Dep., at 154.) Dr. Zhao also testified that, during the interviews, Dr. Batuman "said Chinese work very hard and for a long time, and the people who really produce results are these Chinese people." (Zhao Dep., at 155.)

On November 26, 2001, Dr. Batuman sent Dr. Zhao a letter, via regular mail and email offering her a position as a post-doctoral research associate at a salary of $45,000 per year. (Defs.' 56.1 ¶ 53.) The letter stated:

> This letter is to offer you a postdoctoral research associate in my laboratory with a salary of $45,000 a year for at least two and at most three years.

(Defs.' Ex. 13; *see also* Defs.' Ex. 12.) On or around November 30, 2001, Dr. Zhao contacted Dr. Batuman and accepted the position. (Defs.' 56.1 ¶ 54.)

On December 4, 2001, prior to commencing work in Dr. Batuman's laboratory, Dr. Batuman escorted plaintiff to the offices of the Research Foundation where Dr. Zhao completed and signed the Research Foundation application form and the employee assignment form. (Defs.' 56.1 ¶ 58.) The application form contained the following representations immediately above "Applicant's Signature" line that Dr. Zhao signed at the bottom of the first page:

> I understand that if hired by the Research Foundation, my employment is terminable at will, with or without cause, based on the employment needs of the Research Foundation as it may determine in its sole discretion.

(*Id.* ¶ 59; Defs.' Ex. 14.) The employee assignment form contained the following language immediately above the "Employee Signature" line that Dr. Zhao signed in the middle of the second page:

> I accept the position indicated above as an employee of The Research

Foundation of State University of New York. I understand this position is subject to final approval by the Research Foundation and is terminable at will. I have read the Patient Waiver and Release Agreement and accept it as a condition of employment. I also agree to abide by all policies and regulations of the Research Foundation.

(*Id.* ¶ 60; Defs.' Ex. 15.) Dr. Zhao claims to have signed these forms without examining their content, and did not read these statements "in a very small type face."[4] (Zhao Decl. ¶¶ 14-15.)

### 4. The Research Foundation Letter

On or around February 19, 2002, after Dr. Zhao began working in Dr. Batuman's laboratory, she received a letter from Anthony Selvadurai ("Selvadurai") of the Research Foundation. (Defs.' 56.1 ¶ 64.) Selvadurai's letter stated that plaintiff had been appointed "to the position of Postdoctoral Associate with the Research Foundation" and that, pursuant to the policies of the Research Foundation, her

appointment "may be terminated with or without cause or notice at any time at either [her] option or that of the Research Foundation." (*Id.* ¶ 65; Defs.' Ex. 20.) According to Dr. Zhao, when she received this letter, it was the first time she became aware that she was not considered Dr. Batuman's employee and that her appointment could be terminated with or without cause or notice at any time. (Zhao Decl. ¶ 17.) Zhao further alleges that she became upset by this letter because she accepted the position in Dr. Batuman's laboratory with the understanding it would be guaranteed for a two-year term. (*Id.*)

In late February or early March 2002, Dr. Zhao met with Dr. Batuman and expressed concern about the representation in the letter stating that she could be terminated "with or without cause or notice at any time." (Defs.' 56.1 ¶¶ 66-67.) According to Dr. Zhao, Dr. Batuman told her, in substance, (1) that Dr. Batuman's grants paid Dr. Zhao's salary, (2) that Dr. Zhao was not actually being paid by the Research Foundation, and (3) that, because it was Dr. Batuman's grants and her funds that paid Dr. Zhao, Dr. Zhao had a guaranteed position for at least two years. (Zhao Decl. ¶ 18.) Dr. Zhao alleges that she had received another offer of employment from Sophie Davis School of Biomedical Education, City University of New York and had until March 29, 2005 to accept the job offer. (Zhao Decl. ¶¶ 20-21; Pl.'s Ex. G.) During this discussion, in light of the Selvadurai letter and the existence of another job opportunity, Dr. Zhao requested that Dr. Batuman provide her with a written document guaranteeing the employment for a two-year term. (Zhao Decl. ¶ 19.)

In response, on March 25, 2002, Dr. Batuman provided Dr. Zhao with a letter

---

[4] The Research Foundation seeks to have the Court disregard Dr. Zhao's declaration because it is inconsistent with her prior deposition testimony. (The Research Foundation Reply Brief, at 2-3.) In particular, the Research Foundation argues that, contrary to her declaration, Dr. Zhao testified in her deposition that she read the employment forms before signing them. (*Id.*) The Court need not resolve this issue because resolution of this factual issue is unnecessary for purposes of deciding the summary judgment motions. To the extent that the Research Foundation is seeking to have the declaration disregarded in its entirety, they have not pointed to any other inconsistencies with prior testimony or set forth any basis for doing so with respect to the other statements in the declaration.

intended to address Dr. Zhao's concern. (Defs.' 56.1 ¶ 72.) The letter stated, in relevant part:

> I had thought that our two conversations in the last four weeks had cleared the issues we were speaking about and that is why I did not write to you. But I am happy to do so now.

> I am happy that the lab is working and it is your doing. Regarding the job security as I told you before we have funding for you for two years for sure. In May we will know if we have funding for the third year as well. As I also said you will get a cost of living increase of 3% at the second year. This week we should also know if we can afford a technician, and if you decide we need one we can give an ad to the paper and you can start interviewing people. As long as my laboratory is here at SUNY you have a position in it.

> *  *  *

> I have a feeling that you may be looking for another position, and if you decide to leave please let me know some months in advance. I would like to say that I would like you to stay here and give our experiments a chance to develop into an area and an academic career for you. I think we work well and the worst is over in the sense of getting started.

(Defs.' Ex. 21.)

### 5. Dr. Zhao's Performance on the Laboratory Projects

According to the defendants, Dr. Batuman learned later in 2002 that Dr. Zhao's performance with respect to three laboratory projects was unsatisfactory. Dr. Zhao disputes that her performance was deficient in any respect. A summary of the evidence on these three projects is set forth below.

#### (a) The MMRF Research

During April through July 2002, in connection with the MMRF Research, plaintiff performed the flow cytometry process on blood samples from patients with and without multiple myeloma to identify and count endothelial cells in those samples. (Defs.' 56.1 ¶ 73.) According to Dr. Batuman, she discovered that Dr. Zhao's results were flawed because, in performing the process, she made the following mistakes: (1) she "did not analyze four sub-samples of patient blood stained with unique antibody combinations to accurately identify endothelial cells"; (2) she "did not incorporate control information into the process to establish a baseline for flow cytometer's detection of the antibodies used in the process"; (3) she "did not record the volumes of the patient blood samples and the white blood cell samples from which she had obtained her results to allow calculation of the absolute number of endothelial cells per microliter of patient blood"; and (4) she "did not print out her results of the process using a dot plot display suitable for publication." (Batuman Decl. ¶¶ 125, 130; Defs.' Exs. 22-37.)

On or about May 17, 2002, Dr. Batuman provided Dr. Zhao with a memo summarizing the experimental plans for the laboratory for

the next six months. (Defs.' 56.1 ¶ 78.) In the May 2002 memo, Dr. Batuman explained to Dr. Zhao that her "hope" was that "we" – meaning Dr. Batuman, plaintiff, and the other individuals involved in the lab's research – could conduct the experimental plans described in the memo "and get at least 3" manuscripts ready for submission to scientific journals "in the next 4 months." (Batuman Decl. ¶ 134; Defs.' Ex. 38.)

On or about August 1, 2002, Dr. Batuman reviewed Dr. Zhao's flow cytometry results again to assess her progress on that work. (Defs.' 56.1 ¶ 81.) When Dr. Batuman conducted this review, she concluded that the results from the flow cytometry process were flawed because she had not corrected the flaws that Dr. Batuman had pointed out to her and, thus, the results could not be used to publish a scientific manuscript concerning the MMRF Research. (Defs.' 56.1 ¶¶ 82, 84; Batuman Decl. ¶¶ 147, 152.)

Dr. Zhao disputes that her work on the flow cytometry process was flawed. According to Dr. Zhao, she had arguments with Dr. Batuman on several occasions because (1) Dr. Zhao questioned the number of samples she was asked to process because there were not enough samples for a control group, which would enable her to obtain a statistically relevant result; (2) despite the fact that a series of flow cytometry experiments had been conducted by Dr. Zhang prior to Dr. Zhao's arrival, there were no written protocols to use for experiments and she was expected to reconstruct the experiments without protocols; and (3) Dr. Batuman expected "results" which supported her theories, did not care about the process used to obtain them and, in one instance, threw a printout containing data back in Dr. Zhao's face. (Zhao Decl. ¶¶ 37-39.) Dr. Zhao also claims

to have pointed to a number of problems in the operation of the laboratory. (Id. ¶ 43.) In particular, Dr. Zhao asserted that the number of people working in Dr. Batuman's laboratory was "inconsistent and fluctuated with each academic term," and that there were inexperienced students in the laboratory. (Id.)

(b) The Primate Research Project

In March 2002, in connection with a research project in Dr. Batuman's laboratory know as the "primate research project," Dr. Zhao was asked by Dr. Batuman to perform a test known as an ELISA assay to measure the levels of certain proteins in blood samples from infant primates that had been obtained after a 16-week experimental cycle. (Defs.' 56.1 ¶ 99.) The ELISA assays Dr. Zhao was asked to perform were purchased as kits from one of several companies that provide materials to commercial and research laboratories. (Id. ¶ 100.) Dr. Batuman instructed Dr. Zhao to perform the assays in accordance with the directions contained in the instruction booklet included in the assay kits, reviewed with Dr. Zhao the steps of the ELISA assay as detailed in the booklet, and asked Dr. Zhao to study the booklet carefully. (Id. ¶ 104.) Dr. Batuman claims that, when asked to perform the assays, Dr. Zhao assured Dr. Batuman that she was familiar with the ELISA assay process and that performing the assays was "easy." (Batuman Decl. ¶ 206.)

According to Dr. Batuman, the majority of the results Dr. Zhao obtained from the ELISA assays were unreliable because, when Dr. Zhao performed the assays, she failed to create reliable baseline curves for the measurement of the proteins in the infant primate blood samples. (Id. ¶ 208.) Dr. Batuman further asserts that, because infant primate blood samples similar to those Dr.

Zhao used up in performing the ELISA assays could not be obtained without repeating the entire 16-week experimental cycle of the primate research project again, Dr. Zhao's alleged improper execution of the ELISA assays "resulted in an enormous waste of time and resources." (*Id.* ¶ 214.) Dr. Batuman also claims that, because funding and other resources were unavailable to obtain similar samples by repeating the entire 16-week experimental cycle, the primate research project was never completed and Dr. Batuman and her collaborator, Dr. Smith, were unable to use results from the project to apply for a grant of funds from the National Institutes of Health to conduct further research. (*Id.* ¶¶ 215-16.)

According to Dr. Zhao, this project was tangential to the research focus of Dr. Batuman's laboratory and was not mentioned in the description of duties and responsibilities in the advertisement for the position Dr. Zhao filled. (Zhao Decl. ¶ 49; Pl.'s Exs. A, B, and H.) Moreover, contrary to Dr. Batuman's statements, Dr. Zhao denies ever claiming or assuring Dr. Batuman that performing the assays was easy. (Zhao Decl. ¶ 52.) Dr. Zhao also asserts that there were two other people in the laboratory performing ELISA assays and, thus, it is improper to ascribe blame to her for the purported poor results. (*Id.* ¶ 52.) Dr. Zhao claims that Dr. Batuman never complained about the results she obtained from these experiments nor mentioned that there was a limited number of primate blood samples. (*Id.* ¶¶ 50, 52.) In short, Dr. Zhao disputes that her actions caused the depletion of the entire reserve of primate blood samples. (*Id.* ¶ 53.)

(c) The Hypoxia Manuscript

During the period from January to December 2001, before plaintiff began working in Dr. Batuman's laboratory, Dr. Batuman and other individuals associated with her laboratory conducted research on the effect of reduced oxygen (also known as hypoxia) on the function of certain blood cells in relation to the growth of cancerous tumors. (Defs.' 56.1 ¶ 111.) That research led to the laboratory's preparation and submission of a manuscript to the *Blood Journal* (the "Hypoxia manuscript") on or about February 26, 2002. (*Id.* ¶ 112.) On April 1, 2002, Dr. Batuman received an email from the *Blood Journal* containing peer-review criticisms of the Hypoxia manuscript. (*Id.* ¶ 113.) The peer review criticisms indicated that revisions to the text of the Hypoxia manuscript and to data Figures 1 through 6 in the manuscript would have to be made by the laboratory in response to the criticisms. (*Id.* ¶ 114.) A few days after Dr. Batuman received the April email from the *Blood Journal*, she met with Dr. Zhao and explained that she expected Dr. Zhao to complete the revisions to one of the data figures in the Hypoxia manuscript – Figure 1 – in response to the peer-review criticisms in the email. (*Id.* ¶ 115.) To revise Figure 1, Dr. Zhao needed to perform experiments to isolate two proteins present in the endothelial cells under hypoxic conditions at various time points, and display her results from those experiments using a technique known as a Western Blot. (*Id.* ¶ 116.)

According to Dr. Batuman, Dr. Zhao told her that producing the Western Blot for the revisions to Figure 1 of the Hypoxia manuscript would be simple and that she would be able to complete it easily. (Batuman Decl. ¶ 228.) Dr. Batuman asserts that, during May and June 2002, she reviewed the Western Blots made by Dr. Zhao and found that none of them was of the requisite quality for publication in the Hypoxia manuscript

because they contained flaws that occurred during their production. (*Id.* ¶¶ 230-40.) Dr. Batuman further claims that, during the first two weeks of August 2002, Dr. Zhang and Dr. Batuman produced a Western Blot of the quality needed for publication in the Hypoxia manuscript. (*Id.* ¶¶ 257-59.) The Hypoxia manuscript was later published in the March 15, 2003 issue of *Blood Journal*. (Defs.' 56.1 ¶ 136.)

According to Dr. Zhao, although she mentioned that she was familiar with Western Blots generally and they involved a simple technique, she never advised Dr. Batuman that producing the Western Blot for revisions to Figure 1 of the Hypoxia manuscript would be simple or that she would be able to complete it easily. (Zhao Decl. ¶ 58.) Dr. Zhao points to the scathing and critical evaluation of the manuscript from the reviewers at *Blood Journal* which stated that, among other things, the following:

> Although the reviewers found merit in your paper, there is shared concern that your results lack statistical validation and that considerably more work must be done in order to strengthen your conclusions regarding the importance of Smad1 and Smad2 in the hypoxic response. Moreover, your paper contains a large number of errors which significantly detract from the impact of your work. These problems preclude your paper in Blood. If you think you can adequately respond to these substantive issues as well as other problems noted in review, we are willing to consider a revised paper, which we will carefully re-evaluate. Please be aware that this invitation by no means guarantees eventual acceptance of your manuscript.

(Defs.' Ex. 51.) Dr. Zhao stated that, based upon these criticisms, she realized that she would have to repeat the experiment many times before obtaining a usable result and Dr. Batuman's expectations about producing results in such a short time frame were unrealistic. (Zhao Decl. ¶¶ 57, 60.) Dr. Zhao asserts that even highly experienced researchers frequently have to repeat the Western Blot numerous times in order to get good data. (*Id.* ¶ 59.) Dr. Zhao further claimed that her Western Blot results represented the truth of her experiments and that she could not produce the image that Dr. Batuman wanted in the short time frame she was given. (*Id.* ¶ 60.) Dr. Zhao also claims that Dr. Batuman and Dr. Zhang used her Western Blot results in order to troubleshoot the data and produce the Western Blot "image" that they wanted to publish. (*Id.* ¶ 62.) Moreover, Dr. Zhao points out that Dr. Batuman and Dr. Zhang were unable to produce a Western Blot of publishable quality in the second round of review. (*Id.* ¶ 64.)

### 6. Dr. Batuman's Alleged Treatment of Dr. Zhao

In addition to disputing that her performance on these projects was defective, Dr. Zhao also submits evidence which she believes demonstrates that Dr. Batuman's expectations about her job performance were unrealistic and were caused by Dr. Batuman's stereotypical view that employees of Chinese origin should work harder than other workers. In particular, Dr. Zhao points to the following: (1) when Dr. Zhao went to use the flow cytometry machine in another room, Dr. Batuman complained that Dr. Zhao did not spend enough time in the laboratory, taunted her about the statement in the

recommendation letter that mentioned that Dr. Zhao had slept in the laboratory in a prior job, and questioned why she did not have that same dedication in the laboratory (Zhao Decl. ¶ 30); (2) once at lunch, Dr. Batuman told a story about her Chinese babysitter's husband who would pitch in when the babysitter did not come or could not show up (*Id.* ¶ 31); (3) on one occasion, when Dr. Zhao was on her way to the ladies' room, Dr. Batuman shouted at her to return to the laboratory and, as a result, Dr. Zhao became fearful of leaving the laboratory to use the ladies' room (*Id.* ¶ 32); (4) Dr. Zhao seldom, if ever, left the laboratory to eat her lunch (*Id.* ¶ 33); (5) Dr. Zhao was not permitted to use the library to review citations in scientific literature, but, instead, was given a laptop to use at home to look up the citations (*Id.*); (6) when Dr. Batuman got really angry at Dr. Zhao, she would ridicule Dr. Zhao's heavy accent, which would embarrass Dr. Zhao (*Id.* ¶ 34); and (7) even though Dr. Batuman had placed an advertisement for two positions, Dr. Zhao was the only person hired to work in the laboratory, which did not even employ a full-time technician. (*Id.* ¶ 44.)

### 7. Dr. Zhao's Termination

On August 27, 2002, Dr. Batuman sent Dr. Zhao an email in which she informed Dr. Zhao that she was dissatisfied with her work and her contributions to the laboratory's research. (Defs.' 56.1 ¶ 138.) In that email, Dr. Batuman told Dr. Zhao that, unless she saw "a significant change in [Dr. Zhao's] work habits, productivity, and attitude," her employment would be terminated. (*Id.* ¶ 139; Defs.' Ex. 59.) Approximately one month later, on October 4, 2002, Dr. Batuman met with Dr. Zhao to discuss Dr. Zhao's progress on the MMRF Research. (*Id.* ¶ 143.) Dr. Batuman outlined in that meeting how she was dissatisfied with Dr. Zhao's work. (*Id.* ¶¶ 144-47.) Dr. Zhao insisted that there was no problem with her progress on the MMRF research, that she should be listed as an author on the Hypoxia manuscript, and that Dr. Zhang should not be listed as an author. (*Id.* ¶ 148.)

Following the meeting, on October 4, 2002, Dr. Batuman decided to terminate Dr. Zhao's employment in her laboratory. (*Id.* ¶ 150.) Specifically, according to Dr. Batuman, she terminated Dr. Zhao's employment based on, among other things, the following: (1) Dr. Zhao's failure to properly perform flow cytometry work for MMRF Research in accordance with her requirements; (2) Dr. Zhao's failure to correct errors that she made in performing the flow cytometry process for the MMRF Research which Dr. Batuman had pointed out to her; (3) Dr. Zhao's failure to make sufficient progress on the MMRF Research which resulted in the non-renewal of the grant for that research for funding in 2003; (4) Dr. Zhao's failure to create reliable baseline curves in performing ELISA assays for the primate research project that resulted in an enormous waste of time and resources, as well as the loss of potential funding for Dr. Batuman's laboratory; (5) Dr. Zhao's failure to produce a publishable Western Blot for her revisions to the Hypoxia manuscript, which then required Dr. Batuman and Dr. Zhang to assume responsibility for that task and resulted in a waste of the laboratory's resources and delayed the publication of the manuscript; (6) Dr. Zhao's attitude in response to Dr. Batuman's comments and criticisms regarding her work; and (7) Dr. Zhao's insistence that the results she obtained from experimental tasks she conducted in the laboratory were correct or publishable. (Batuman Decl. ¶ 290.)

## B. PROCEDURAL HISTORY

Plaintiff initially filed the complaint in this action in the Supreme Court of the State of New York, Kings County, and, on January 20, 2004, the case was removed to this Court. The case was originally assigned to the Honorable Nina Gershon and, on February 10, 2006, the case was reassigned to the undersigned. Defendants subsequently moved for summary judgment. Oral argument was held on August 11, 2006.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted). The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is

rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g. Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

## B. SUBJECT MATTER JURISDICTION

The Research Foundation argues that the Court does not have subject matter jurisdiction over Dr. Zhao's Title VII claims against the Research Foundation because Dr. Zhao failed to name the Research Foundation as a respondent in her February 14, 2003 Charge of Discrimination filed with the New York State Division on Human Rights ("SDHR"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). As set forth below, the Court finds this argument unpersuasive.

The filing of a complaint with the EEOC or an authorized state agency, that names the defendant, is a prerequisite to commencing a Title VII action. 42 U.S.C. § 2000e-5(f)(1)(a); *accord Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir. 1991). However,

courts have recognized "an exception to the general rule that a defendant must be named in the EEOC complaint." *Id.* The Second Circuit has articulated the rationale for this exception:

> Because these charges generally are filed by parties not versed in the vagaries of Title VII and its jurisdictional and pleading requirements, we have taken a "flexible stance in interpreting Title VII's procedural provisions," *Egelston v. State Univ. College at Geneseo*, 535 F.2d 752, 754, 755 (2d Cir. 1976), so as not to frustrate Title VII's remedial goals.

*Id.* This exception, which is referred to as the "identity of interest" exception, allows a Title VII action to proceed against a party that was not named in the EEOC complaint "where there is a clear identity of interest between the unnamed defendant and the party named in the administrative charge." *Id.*

In order to determine whether the "identity of interests" exception is applicable, there are four factors that a court should consider:

> (1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; (2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; (3) whether its absence from the EEOC proceedings resulted in actual

prejudice to the interests of the unnamed party; [and] (4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Id.* at 209-10 (quoting *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977)).

As to the first factor, although the Research Foundation could have been named in the EEOC complaint, the roles of the Research Foundation and SUNY, as it relates to employees, are substantially intertwined. In particular, the Research Foundation acts as the employer, but delegates the hiring and other employment decisions to the SUNY representative. Thus, it is not surprising that an employee might not understand, in filing an EEOC complaint, that both the Research Foundation and SUNY should be named.

With respect to the second factor, the relationship between the Research Foundation and SUNY creates nearly "identical interests with respect to conciliation and compliance." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1242 (2d Cir. 1995). Specifically, although the Research Foundation is a separate entity from SUNY, the purpose for its existence is to administer grants awarded to SUNY and to provide other services in support of SUNY's mission. Thus, SUNY's grant money flows through the Research Foundation and the Research Foundation employees operate under the direction of SUNY employees. Under such circumstances, the intertwined relationship between SUNY and the Research Foundation and accompanying identity of interests with respect to conciliation and compliance result in this factor weighing heavily in Dr. Zhao's favor. *See Fox v. City Univ. of New York*, No.

95-CV-4398 (CSH), 1996 WL 384915, at *7 (S.D.N.Y. July 10, 1996) ("The whole purpose of the [CUNY Research] Foundation was to streamline the process of procuring and implementing grants for the colleges of the City University. In that goal, the Foundation acted as a single integrated unit with the University, and the individual colleges.").

The third factor – namely, whether there has been prejudice to the Research Foundation – also strongly favors Dr. Zhao. In particular, the Research Foundation received notice of the Discrimination Charge filed at the EEOC *before* SUNY was put on notice. In fact, it was the Research Foundation that transmitted the charge to SUNY via a memorandum dated January 27, 2003. (Pl.'s Ex. J.) Therefore, the Research Foundation cannot claim that they were unaware of the discrimination charge from its inception and has failed to demonstrate any prejudice resulting from not being specifically named in that charge.

The fourth factor favors the Research Foundation. There is no indication that the Research Foundation represented to Dr. Zhao that its relationship with Dr. Zhao should be through the named party. To the contrary, Dr. Zhao was advised by SUNY, in its position statement to the SDHR, that Dr. Zhao was "an employee of the Research Foundation, a non-state, private entity" and that SUNY DMC was "unable to respond to those allegations concerning the Research Foundation" since the Research Foundation was "not a party to this matter." (Defs.' Ex. 77.)

Having carefully considered these factors, the Court finds that the "identity of interest" exception is applicable here, especially given the close, intertwined relationship between the two entities and the lack of prejudice to the Research Foundation. *See Fox*, 1998 WL

273049, at *6 (finding identity of interest under the four-factor *Johnson* test between CUNY and the Research Foundation of CUNY and, thus, denying motion to dismiss Title VII claims against the Foundation, even though the EEOC complaint did not name the Foundation). Accordingly, the Court refuses to dismiss the Title VII claims against the Research Foundation for lack of subject matter jurisdiction.

## C. Discrimination Claim

Defendants argue that Dr. Zhao's discriminatory termination claim fails as a matter of law because the undisputed facts demonstrate that she was terminated for legitimate, non-discriminatory reasons. For the reasons set forth below, the Court finds that summary judgment on that ground is unwarranted.[5]

### 1. Legal Standard

Because plaintiff presents no direct evidence of discriminatory treatment based on her national origin, the Court reviews her claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). To establish a *prima facie* case of racial discrimination under Title VII, a plaintiff must show (1)

membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the' termination." *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996) (quoting *McDonnell Douglas*, 411 U.S. at 802))). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

To meet this burden, the plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he or she

---

[5] In addition to alleging claims under Title VII, plaintiff alleges discrimination under New York State Human Rights Law. Claims of discrimination brought under New York state law are analyzed using the same framework as claims brought under Title VII, and the outcome under state law will be the same as the outcome under Title VII. *See Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714-15 (2d Cir. 1996).

satisfies "*McDonnell Douglas'* s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Ass'n,* 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consolidated Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see Lapsley v. Columbia Univ.*, 999 F. Supp. 506, 513-16 (S.D.N.Y. 1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### 2. Application

At the outset, the Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas*, based upon, as discussed more fully below in connection with prong three, plaintiff's membership in a protected class, as well as evidence relating to the circumstances of her hiring, her work at the laboratory, and her termination. In response, defendants have established a legitimate non-discriminatory reason for her dismissal, namely, plaintiff's failure to perform her job adequately. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find discrimination on the basis of national origin by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *see also Siano v. Haber*, 40 F. Supp. 2d 516, 520 (S.D.N.Y.), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999); *Lapsley*, 999 F. Supp. at 515.

In response to defendants' motions for summary judgment, plaintiff points to several pieces of evidence in support of her argument that a reasonable jury could find that defendants' proffered non-discriminatory reason for the termination was a pretext for discrimination based on national origin. First, Dr. Zhao points to statements she alleges were made to her by Dr. Batuman at the time of her interview indicating that she was making hiring decisions based upon ethnic stereotyping. In particular, according to Dr. Zhao, Dr. Batuman told her that she liked to employ Chinese people because they work very hard and very long hours. For example, Dr. Zhao testified that, during the interviews, Dr. Batuman "said Chinese work very hard and for a long time, and the people who really produce results are these Chinese people." (Zhao Deposition, at 155.) In addition, Dr. Zhao alleges that Dr. Batuman stated that she was impressed by the recommendation letter of a doctor from one of Dr. Zhao's previous

jobs, which mentioned that on one occasion Dr. Zhao had "slept in the lab" to ensure the proper time course for an experiment. (Zhao Decl. at ¶¶ 8-9.)

Second, Dr. Zhao alleges the use of this type of ethnic stereotyping by Dr. Batuman in employment decisions, including her termination, is further evidenced by her treatment of Dr. Zhao in the laboratory, as well as other ethnic comments relating to national origin. Specifically, Dr. Zhao points to the following evidence: (1) when Dr. Zhao went to use the flow cytometry machine in another room, Dr. Batuman complained that Dr. Zhao did not spend enough time in the laboratory, taunted her about the statement in the recommendation letter that mentioned that Dr. Zhao had slept in the laboratory in a prior job, and questioned why she did not have that dedication in the laboratory (Zhao Decl. ¶ 30); (2) once at lunch, Dr. Batuman told a story about her Chinese babysitter's husband and how the husband would help out when the babysitter did not come or could not show up (Zhao Decl. ¶ 31); (3) on one occasion, when Dr. Zhao was on her way to the ladies' room, Dr. Batuman shouted at her to return to the laboratory and, as a result, Dr. Zhao became fearful of leaving the laboratory to use the ladies' room (Zhao Decl. ¶ 32); (4) Dr. Zhao seldom, if ever, left the laboratory to each her lunch (Zhao Decl. ¶ 33); (5) Dr. Zhao was not permitted to use the library to review citations in scientific literature, but, instead, was given a laptop to use at home to look up the citations (Zhao Decl. ¶ 33); (6) when Dr. Batuman got really angry at Dr. Zhao, she would ridicule Dr. Zhao's heavy accent, which would embarrass Dr. Zhao (Zhao Decl. ¶ 34); and (7) when Dr. Zhao attended a party at Dr. Batuman's apartment in August 2002 with several Turkish guests, Dr. Batuman asked Dr. Zhao whether she though Turkish people are "more lovely" than Chinese people (Zhao Dep. 636-39, 749-50).

Third, not only does Dr. Zhao dispute defendants' claim that her performance was defective, but she also points to evidence regarding a lack of resources and staffing in the laboratory, which she also attributes to Dr. Batuman's unrealistically high expectations regarding her performance based on ethnic stereotyping of individuals of Chinese origin. For example, Dr. Zhao points to evidence that, even though Dr. Batuman had placed an advertisement for two positions, Dr. Zhao was the only person hired to work in the laboratory, which did not even employ a full-time technician. (Zhao Decl. ¶ 44.)

Defendants argues that such evidence is insufficient to defeat the motions for summary judgment. The Court recognizes that the fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect, does not demonstrate, by itself, that the employer's proffered reasons are a pretext for termination. *See, e.g., Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761 (8th Cir. 1998) (stating that "the relevant inquiry was whether [plaintiff] created a genuine issue of material fact as to whether her discharge was gender-based and not whether her termination was reasonable" and noting that "[i]t is not the task of this court to determine whether [the investigator's] investigation was sufficiently thorough or fair"). Moreover, the Court notes that, in the instant case, there is certainly much evidence in the record from which a jury could reasonably conclude that Dr. Zhao was terminated not because of her national origin, but rather because she failed to perform her job in a competent manner. However, having carefully examined the evidence contained in

the record, the Court concludes that, when viewed as a whole and in the light most favorable to plaintiff, the evidence creates genuine issues of material fact as to whether defendants' stated reason for terminating plaintiff was pretextual, and whether Dr. Zhao's national origin was a factor in the termination decision. In particular, the Court relies on, among other things, the evidence regarding statements allegedly made by Dr. Batuman at the time she hired Dr. Zhao which reflect that she may have higher performance expectations for individuals of Chinese origin because of her belief in certain ethnic stereotypes. The evidence regarding such statements combined with other evidence – including evidence that Dr. Batuman made other statements during her employment relating to Dr. Zhao's national origin and also that Dr. Batuman may have imposed work requirements and expectations that would not have been imposed on a non-Chinese employee – provides a factual basis from which a jury could infer discriminatory intent and, thus, creates genuine issues of material fact that defeat defendants' motions for summary judgment.

The Court finds defendants' arguments in support of the motions for summary judgment unpersuasive. In the sex discrimination context, both the Supreme Court and the Second Circuit have held that decisions resulting from "stereotyped" impressions or assumptions about the characteristics or abilities of women violate Title VII. *See City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 708 & 708 n.13 (1978); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1284 & n.20 (11th Cir. 2000) (finding that employer could be held liable under Title VII where it "deliberately and systematically excluded women from food server positions based on a sexual stereotype

which simply associated 'fine-dining ambiance' with all-male food service") (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)); *see also Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) ("Evidence of sexual stereotyping may provide proof that an employment decision or an abusive environment was based on gender."); *Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir. 1991) (finding that sex-stereotyping comments suggested that employer made promotion decision on the basis of stereotypical images of men and women). These same principles undoubtedly apply with equal force to racial and ethnic stereotyping. *See, e.g., Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 58-61 (1st Cir. 1999) (applying principles regarding sex stereotyping, including discussion of Supreme Court's *Price Waterhouse* decision, in racial discrimination context).

Nor does it matter that the stereotype involved positive attributes that could have initially favored a plaintiff at the time of hiring. If an employer has crossed the line into making employment decisions based on ethnic stereotyping rather than on the merits, one could easily see how a stereotype that may benefit an employee on one day could result in an adverse employment action on another day. This type of stereotyping in employment decisions, if proven, is precisely the type of evil that Title VII is designed to prevent and that is exactly what Dr. Zhao alleges happened here. In other words, Dr. Zhao argues that Dr. Batuman was making employment decisions motivated by ethnic stereotyping – namely, that Chinese individuals work harder and longer than non-Chinese individuals – which subsequently led to an adverse employment action in the form of termination because of unrealistic expectations regarding performance. Even if

the stereotyping initially helped Dr. Zhao in the hiring process, that fact would not immunize her employer if such stereotyping subsequently resulted in a negative view of her by her employer which led to her termination. Moreover, to the extent that defendants argue that statements at the time of hiring are irrelevant to the reasons for termination, the Court disagrees. If it is demonstrated that an employer is making any employment decisions based upon these impermissible stereotypes and an employee subsequently suffers an adverse employment action that potentially implicates such stereotypes, a jury may reasonably infer that the adverse employment action resulted from the impermissible stereotyping, as opposed to the proffered non-discriminatory reason for the action. As the Supreme Court stated in *Price Waterhouse* with regard to sex stereotypes, "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for [i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Price Waterhouse v. Hopkins*, 490 U.S. at 251 (internal quotation marks omitted), *superceded by statute on other grounds*. That same rationale applies to the type of ethnic stereotyping alleged in this case.

Other courts have refused to grant summary judgment in cases where these type of allegations were made and had evidentiary support. For example, in *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 817 (9th Cir. 2002), the plaintiff alleged that he was terminated due to unrealistic job expectations placed on him because of stereotyping about his Korean heritage. The Ninth Circuit reversed the district court's decision to grant summary judgment on a disparate treatment claim. *Id*. at 819. Specifically, the court found that there were sufficient facts from which a jury could find that his former employer's reasons for firing him were pretextual where employee presented direct evidence that his supervisor abused him and required him to work longer hours because he believed Korean workers were superior to Mexicans and Americans, and that he was ultimately fired for failing to conform to the purported ethnic stereotype. *Id.* at 818-19.

Similarly, in *Dow v. Donovan*, 150 F. Supp.2d 249 (D. Mass. June 19, 2001), the court denied summary judgment on a gender discrimination claim by an associate attorney who had been terminated following denial of a partnership position at a law firm. Part of the evidence relied upon by plaintiff to defeat the summary judgment motion was the affidavits of several law partners in which they admitted that they considered plaintiff's gender as a positive attribute in making their employment decision. *Id.* at 265. Although the court found such statements to be ambiguous on the issue of pretext, the court found that, "[i]nterpreting these comments in the light most favorable to the plaintiff, a reasonable jury could find that plaintiff was evaluated and judged on account of her gender, and that the decision to deny her partnership was affected by negative gender stereotypes." *Id*.

In sum, although defendant has pointed to portions of the record that undermine the strength of various aspects of Dr. Zhao's proffered evidence of discrimination as it relates to her termination, the evidence is sufficient for Dr. Zhao to survive defendants' summary judgment motions.

## D. Hostile Work Environment Claim

Defendants also argue that they are entitled to summary judgment on the hostile work environment claim because Dr. Zhao has failed to establish a *prima facie* case.

A hostile work environment, in violation of Title VII, is established by a plaintiff showing that his or her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003). "Isolated instances of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (holding that "simple teasing . . . offhand comments, isolated incidents (unless extremely serious)" will not amount to discriminatory changes in the "terms and conditions of employment") (internal citations and quotations omitted); *Brennan v. Met. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (holding that "[i]solated, minor acts or occasional episodes do not warrant relief"); *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir. 1999) (holding that "to meet his burden, the plaintiff must show more than a few isolated incidents" and "evidence solely of sporadic" discrimination does not suffice) (internal quotations omitted); *Knight v. City of N.Y.*, 303 F. Supp. 2d 485, 500 (S.D.N.Y. 2004) (denying hostile work environment claim where incidents were "too remote"); *Ruggieri*, 146 F. Supp. 2d at 217-18 (holding that a "collection of administrative mixups, minor annoyances, and perceived slights cannot be considered severe or pervasive harassment"); *Francis v. Chem. Bank. Corp.*, 62 F. Supp. 2d 948, 959 (E.D.N.Y. 1999) (dismissing hostile work environment claim where plaintiff only alleged four incidents).

The conduct in question must be "severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Feingold v. N.Y.*, 366 F.3d 138, 150 (2d Cir. 2004). Other factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Terry*, 336 F.3d at 148 (quotation marks omitted). The Second Circuit has noted, however, that "[w]hile the standard for establishing a hostile work environment is high, . . . [t]he environment need not be 'unendurable' or 'intolerable.'" *Id.* (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)). Moreover, although a hostile work environment generally consists of "continuous and concerted" conduct, "a single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." *Feingold*, 366 F.3d at 150 (quotations and citation marks omitted) (alteration in original).

Further, to succeed on a hostile work environment claim in the instant case, plaintiff must link the actions by defendants to her national origin. Although "[f]acially neutral incidents may be included, of course, among the 'totality of the circumstance' that courts consider in any hostile work environment

claim," plaintiff nevertheless must offer some evidence from which a reasonable jury could infer that the facially-neutral incidents were in fact discriminatory. *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002); *see also Nakis v. Potter*, No. 01-CV-10047 (HBP), 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004) (holding that "[h]ostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable" under Title VII) (citing *Brennan v. Met. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class.")).

In the instant case, Dr. Zhao asserts that certain remarks related to her national origin were made by Dr. Batuman during her employment resulting in a hostile work environment. In particular, as outlined earlier with respect to the discrimination claim, Dr. Zhao claims the following: (1) on at least two occasions, Dr. Batuman mimicked her accent (Zhao Decl. ¶ 34; Zhao Dep. 644-45, 756); (2) Dr. Batuman made a comment at a party in August 2002 asking Dr. Zhao to compare Turkish people to Chinese people (Zhao Dep. 636-39, 749-50); and (3) Dr. Batuman made a comment at a lunch in front of students in July or August 2002 about her Chinese babysitter bringing her husband to help out (Zhao Dep. 641-42). Dr. Zhao states that these comments resulted in great embarrassment and humiliation. For example, with respect to the Chinese babysitter comment, Dr. Zhao stated she was "embarrassed and ashamed" because she was "insinuating that I did not measure up to the standards of my people and at the same time making it seem as if we were slaves." (Zhao Decl. ¶ 31.) If these remarks were the only evidence being offered, such evidence alone would not be sufficiently severe or

pervasive to establish a hostile work environment under well-settled Second Circuit case authority.

However, Dr. Zhao also relies on facially neutral incidents in support of her hostile work environment claim, including the fact that she was expected to stay at her laboratory bench and to eat her lunch at the laboratory, was yelled at for going to the bathroom and leaving the laboratory, and was told she was not permitted to use the library to review citations, but rather was given a laptop to use at home for that work.

Defendants argue that the Court should not consider these facially neutral incidents because there is no circumstantial evidence or other basis from which a jury could infer these incidents were based on Dr. Zhao's national origin. The Court finds that argument unpersuasive and is unable to conclude as a matter of law that these facially neutral incidents should not be considered. Although it is not the only inference that can be drawn from these facts, these facially neutral incidents could be consistent with an employer who is punishing an employee for not achieving a standard of performance that has been improperly inflated due to impermissible ethnic stereotyping. Thus, if Dr. Zhao is able to prove from Dr. Batuman's alleged comments during the interview process and period of employment that Dr. Batuman believed that Chinese employees should work longer and harder than anyone else, a jury could infer that these incidents, relating to pervasive restrictions on her working conditions, were caused by the ethnic stereotypes that Dr. Batuman allegedly harbored. Defendants may be able to prove that these working conditions were not imposed by Dr. Batuman or, even if they were, they were based on Dr. Zhao's inability

to perform her job in a competent manner under an objective standard, rather than based on ethnic stereotyping. However, there is sufficient evidence on both sides of this issue to raise an issue of material fact that should be resolved by a jury. Accordingly, defendants' motions are denied as to Dr. Zhao's hostile work environment claim.

## E. TITLE VII LIABILITY OF THE RESEARCH FOUNDATION

The Research Foundation also argues that, because Dr. Zhao does not claim that any employee of the Research Foundation was involved in the creation of the alleged hostile work environment, the Research Foundation is entitled to summary judgment as a matter of law. In particular, the Research Foundation asserts that any acts by Dr. Batuman cannot be imputed to the Research Foundation under Title VII. The Court disagrees.

As a threshold matter, the Court notes that the relationship between the Research Foundation and SUNY is so close that at least one court has found that they operated as joint, integrated employers for purposes of Title VII. *See Pemrick v. Stracher*, 67 F. Supp. 2d 149, 165 (E.D.N.Y. 1999). The Second Circuit has held that separate corporate entities, if they are sufficiently interrelated, can be held to be joint or integrated employers under Title VII. *See Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 (2d Cir. 1995). In analyzing this issue, the Second Circuit has instructed district courts to consider four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook*, 69 F.3d at 1240 (internal quotation marks omitted); *accord Gulino v. N.Y. State Educ. Dep't*, 460 F.3d

361, 378 (2d Cir. 2006). In *Pemrick*, the court applied this test and found the Research Foundation and SUNY to be joint, integrated employers under Title VII:

> [T]he defendant State University of New York and the Research Foundation of SUNY are inseparable in terms of their mission and their money. The Research Foundation of SUNY does not exist but for SUNY, and no research grants flow to SUNY except through the Research Foundation of SUNY. Defendants admit that the employees of the Research Foundation of SUNY operate under the direction and control of SUNY faculty members. Under the facts in this record, the Court has no hesitancy in declaring that SUNY and the Research Foundation of SUNY are joint, integrated employers for purposes of Title VII, and that both are properly deemed Pemrick's employer for the purposes of this action.

67 F. Supp.2d at 164-65 (citation omitted).

Similarly, in *Fox v. City Univ. of N.Y.*, 94-CV-4398 (CSH), 1996 WL 384915 (S.D.N.Y. July 10, 1996), the court denied the Research Foundation of the City University of New York's motion for summary judgment where it claimed it had no involvement in the alleged discriminatory conduct in connection with a program which was funded by the Research Foundation of CUNY, but was run by CUNY. In denying that motion, the court made the following determination:

> There is . . . substantial evidence that the Foundation, the University, and the College should be characterized as

a single integrated employer with respect to the Program. Considering the four factors-interrelatedness of operations, central control of labor relations, common management, and common ownership–in turn, it is clear that the Foundation, the University and the College significantly shared employer responsibilities. The key issue, centralized labor relations, supports this conclusion. In terms of labor relations, the overlap between the Program and the Foundation was analogous to the relationship between a subsidiary and its parent corporation.

*Id.* at *6. The court further noted that "[t]he whole purpose of the Foundation was to streamline the process of procuring and implementing grants for the colleges of the City University," and "[i]n that goal, the Foundation acted as a single integrated unit with the University and the individual colleges." *Id.* at *7.

Although the circumstances of the instant case are closely analogous to both *Pemrick* and *Fox*, the Second Circuit has recently emphasized that the "single or joint employer" test "has been confined to two corporate contexts: first, where the plaintiff is an employee of a wholly-owned corporate subsidiary; and second, where the plaintiff's employment is subcontracted by one employer to another, formally distinct, entity." *Gulino*, 460 F.3d at 378 (footnotes omitted). The Second Circuit cautioned that "[e]xtending this theory to cases involving the complex relations between levels of government would be impracticable and would implicate . . . constitutional concerns." *Id.* (footnote omitted). The instant case does not include two levels of government because the Research Foundation is a private corporation.

Moreover, the Research Foundation operates with SUNY within a framework that is similar to a parent/subsidiary relationship. However, the Court still heeds the Second Circuit's general guidance and believes it must proceed with great caution in expanding this test beyond the parent/subsidiary context, especially where a government entity is involved. In the instant case, the Court need not decide this issue of whether there can be a finding of employer liability under this "single or joint employer" theory because liability can be analyzed in the instant case under traditional indicators of common law agency.

As the Second Circuit has noted, "Title VII itself explicitly recognizes that 'any agent' of an employer will be liable for discriminatory behavior." *Gulino*, 460 F.3d at 378-89 (citing 42 U.S.C. § 2000e(b)). For example, in hostile work environment cases, it is well-settled that "[o]nce a plaintiff has established the existence of a hostile workplace, she must then demonstrate that the harassing conduct 'which created the hostile situation should be imputed to the employer.'" *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 63 (2d Cir. 1998) (quoting *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 63 (2d Cir. 1992)). More specifically, "[u]nder Title VII, an employer need not have actual knowledge of the harassment; an employer is considered to have notice of sexual harassment if the employer – or any of its agents or supervisory employees – knew or should have known of the conduct." *Id.* at 63. "The question of when an official's actual or constructive knowledge will be imputed to the employer is determined by agency principles." *Id.*

In the instant case, as discussed *supra*, there is substantial evidence suggesting that the Research Foundation delegated much of the employment responsibilities as it relates to Dr. Zhao – including hiring decisions, job assignments, and the day-to-day management of the Research Foundation employees – to Dr. Batuman. Given such evidence, this Court cannot conclude as a matter of law that Dr. Batuman was not functioning as an agent of the Research Foundation as it related to Dr. Zhao's employment conditions and the termination decision regarding Dr. Zhao. Accordingly, the Research Foundation's request for summary judgment on that ground is denied.[6]

## F. BREACH OF CONTRACT CLAIM

The Research Foundation argues that Dr. Zhao's breach of employment contract claim against the Research Foundation must be dismissed on several grounds. Research Foundation asserts that Dr. Zhao was an at-will employee under New York law and that there is no factual or legal basis for the existence of an employment contract. In particular, the Research Foundation argues that Dr. Zhao's reliance on Dr. Batuman's letter regarding Dr. Zhao's employment is misguided because (1) the letter was not a valid contract in that there was no consideration, no offer, and no meeting of the minds; and (2) the letter was not a modification to plaintiff's at-will employment status. For the reasons set forth below, the Court concludes that there are material issues of fact that preclude summary judgment on the issues of whether there was an employment contract between the parties establishing an employment relationship for a minimum of two years and, if so, whether that contract was improperly breached.

"It is settled law in New York, that absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at-will terminable at any time by either party." *Sabetay v. Sterling Drug, Inc.*, 514 N.Y.S.2d 209, 21 (N.Y. 1987). However, this presumption can be rebutted "by proof that an employer expressly agreed to limit its right to discharge an employee." *Yaris v. Arnot-Ogden Memorial Hospital*, 891 F.2d 51, 52 (2d Cir. 1989) (citing *Murphy v. American Home Prods.*, 58 N.Y.2d 293, 300, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86, 89 (N.Y. 1983)).

In making this determination, "'[a]ny single act, phrase or other expression' is insufficient to demonstrate such a limitation." *Yaris*, 891 F.2d at 52 (quoting *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 467, 457 N.Y.S.2d 193, 198, 443 N.E.2d 441 (N.Y. 1982) (citations and quotations omitted). Instead, "a court must look to the totality of the attendant circumstances to determine whether an employer agreed to terminate only for cause." *Yaris*, 891 F.2d at 52 (citation omitted); *accord Gorrill v.*

---

[6] The Research Foundation also suggests in a summary fashion that it is entitled to summary judgment on the hostile work environment claim based upon the affirmative defense articulated by the Supreme Court in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca-Raton*, 524 U.S. 775 (1998). (Research Foundation Br., at 17-18.) However, there is simply not a sufficient factual record from which the Court could conclude as a matter of law that the Research Foundation (1) exercised reasonable care to prevent and correct promptly the alleged harassing behavior, and (2) the employee unreasonably failed to take advantage of the employer's preventive or corrective procedures. Accordingly, summary judgment based upon the affirmative defense is denied.

*Icelandair/Flugleidir*, 761 F.2d 847, 852-53 (2d Cir. 1985).

The Court concludes that an issue of fact exists as to whether the March 25, 2002 letter delivered by Dr. Batuman to Dr. Zhao constitutes an express limitation on the "terminable at-will" employment relationship articulated in Dr. Zhao's employment application with the Research Foundation. As indicated in that letter, it was specifically written in response to concerns expressed by Dr. Zhao about the term of her employment, which were prompted by a statement in a February 12, 2002 letter from the Research Foundation to Dr. Zhao confirming her appointment and stating that it was terminable with or without cause or notice. That statement by the Research Foundation was inconsistent with Dr. Zhao's understanding that she had an agreement to work for at least two years for Dr. Batuman, which was based upon the written offer of employment from Dr. Batuman received several months earlier, which stated, "[t]his letter is to offer you a postdoctoral research associate in my laboratory at a salary of $45,000 a year for at least two and most likely three years." (Defs.' Ex. 12.) In order to assure Dr. Zhao not to worry about the absence of such language in the Research Foundation letter, Dr. Batuman's March 25 letter stated:

> Regarding the job security as I told you before we have funding for you for two years for sure. In May we will know if we have funding for the third year as well. As I also said you will get a cost of living increase of 3% at the second year. This week we should also know if we can afford a technician, and if you decide we need one we can give an ad to the paper and you can start interviewing people. As

long as my laboratory is here at SUNY you have a position in it.

(Defs.' Ex. 21.) This letter, as well as the other evidence regarding additional assurances given to Dr. Zhao by Dr. Batuman regarding the term of her employment, are sufficient to defeat the summary judgment motion and create issues of fact regarding whether the at-will employment relationship was altered.

### 1. Consideration

Although the Research Foundation argues that there is no evidence of any consideration for the modification Dr. Zhao's at-will relationship, the Court finds that argument unpersuasive. It is well-settled that "the presence of consideration . . . is a fundamental requisite" to any valid contract. *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (N.Y. 1982). Consideration "consists of either a benefit to the promisor or a detriment to the promisee," and "[i]t is enough that something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him." *Id.* (alteration in original). Moreover, "the value or measurability of the thing forborne or promised is not crucial so long as it is acceptable to the promisee." *Id.*

The Research Foundation argues that there is no possibility of valid consideration between Dr. Zhao and her employer with respect to the March 25 letter. However, Dr. Zhao argues that, in consideration of a modification of an "at will" employment relationship to a term of employment of at least two years, she rejected a job offer from another laboratory and continued her employment with the Research Foundation. Dr. Zhao's argument regarding consideration

is well-supported under New York law. In particular, in *Weiner*, the New York Court of Appeals cited *Corbin on Contracts* for the proposition that an employee's continued employment or relinquishing of another job opportunity can constitute consideration in exchange for the conversion of an "at will" employment into a definite term of employment:

> "[I]f the employer made a promise, either express or implied, not only to pay for the service but also that the employment should continue for a period of time that is either definite or capable of being determined, that employment is not terminable by him 'at will' after the employee has begun or rendered some of the requested service or has given any other consideration * * * This is true even though the employee has made no return promise and has retained the power and legal privilege of terminating the employment 'at will'. The employer's promise is supported by the service that has begun or rendered or by the other executed consideration."

*Weiner*, 57 N.Y.2d at 465, 457 N.Y.S.2d 193 (quoting 1A Corbin, Contracts § 152, p 14). As one court has noted, "[i]n a number of cases, both within and without New York, courts have found that consideration for a contract may be supplied by actual forbearance from exercising one's rights to unilaterally cancel a contract terminable at will; even though there was no obligation to continue the at-will relationship in the first instance." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 254 (S.D.N.Y. 1999) (collecting cases); *see also Stern v. Espeed, Inc.*, No. 06-CV-958, 2006 WL 2741635, at *2 (S.D.N.Y. Sept. 22, 2006) (holding that "continuation of employment alone is sufficient consideration to enforce" a post-employment arbitration agreement); *Kaplan v. Aspen Knolls Corp.*, 290 F. Supp. 2d 335, 339 (E.D.N.Y. 2003) ("[T]he continued service by an employee is sufficient consideration to support an employer's promise to pay an at-will employee a bonus."); *Shebar v. Sanyo Business System Corp.*, 544 A.2d 377, 383, 111 N.J. 276, 289 (N.J. 1988) (ample consideration for enforceable contract existed where employee turned down job offered by another employer when current employer agreed to modify an "at will" employment into an employment with termination for cause only).

### 2. Meeting of the Minds

The Research Foundation's arguments that the Court should find as a matter of law that there was no offer and no meeting of the minds in connection with the March 2002 letter are similarly unpersuasive.

"There is no enforceable agreement if the parties have failed to agree on all of its essential terms or if some of the terms are too indefinite to be enforceable." *Durante Bros. and Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 252 (2d Cir. 1985); *see also Michael Coppel Promotions Pty. Ltd. v. Bolton*, 982 F. Supp. 950, 954 (S.D.N.Y. 1997) ("Under New York law, an agreement is enforceable if a meeting of the minds has occurred as to the contract's 'material terms.'") (citing *Four Seasons Hotels Ltd. v. Vinnik*, 127 A.D.2d 310, 317, 515 N.Y.S.2d 1, 6 (N.Y. App. Div. 1987)); *accord Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 254 (S.D.N.Y. 1997). Thus, "it is rightfully well settled in the common law of contracts . . . that a mere agreement to agree, in which a

material term is left for future negotiations, is unenforceable." *Martin Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109, 417 N.E.2d 541, 436 N.Y.S.2d 247 (1981). The New York Court of Appeals has explained:

> The first step then is to determine whether there is a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract (*Martin Delicatessen, Inc. v. Schumacher*, *supra,* 52 N.Y.2d at 109, 436 N.Y.S.2d 246, 417 N.E.2d 541). As we emphasized in *Martin Delicatessen*, "definiteness as to material matters is of the very essence of contract law. Impenetrable vagueness and uncertainty will not do." Of course, not all terms of a contract need be fixed with absolute certainty; "at some point virtually every agreement can be said to have a degree of indefiniteness . . . While there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be 'pedantic or meticulous' in interpreting contract expressions." (*Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203) [sic].

*Express Indus. and Terminal Corp. v. New York State Dep't of Transportation*, 93 N.Y.2d 584, 589-90, 693 N.Y.S.2d 857, 715 N.E.2d 1050 (N.Y. 1999); *see also* 1 E. Allan Farnsworth, Farnsworth on Contracts, § 3.10, at 235 (2d ed. 1998) ("Conduct that would lead a reasonable person in the other party's position to infer a promise in return for performance or promise may amount to an offer.").

In the instant case, Dr. Zhao points to material matters contained in the March 25, 2002 letter from Dr. Batuman, which she believes demonstrate an offer and meeting of the minds, including length of time (*i.e.*, "two years for sure" and "[i]n May, we will know if we have funding for a third year as well") and salary (*i.e.*, "a cost of living increase of 3% at the second year"). The letter also refers to a belief that Dr. Zhao is considering other employment and encourages her to stay in her current position. This letter must be viewed in the context of the initial offer of employment from Dr. Batuman in November 2001 which established "a salary of $45,000 a year for at least two and at most three years." Having reviewed this evidence, the Court finds that there are genuine issues of material fact created by the documentary evidence and deposition testimony in the record as to whether there was an offer and subsequent meeting of the minds on material terms of an employment contract based upon the March 25 letter.

### 3. Apparent Authority

The Research Foundation also argues that, even if the March 25 letter constituted a modification to plaintiff's employment at-will status, Dr. Batuman had no authority to modify the terms of plaintiff's employment status with the Research Foundation. Specifically, the Research Foundation asserts that Dr. Batuman had no actual authority to modify the terms of Dr. Zhao's employment with the Research Foundation because the necessary elements of an agency relationship have not been established and Dr. Batuman did not possess apparent authority. For the reasons set forth below, the Court finds that there is a genuine issue of material fact as to whether Dr. Batuman had the apparent

authority to modify the terms and conditions of Dr. Zhao's employment with Research Foundation.

A principal cloaks an agent with apparent authority when it allows that agent to operate in a manner that causes a third party to reasonably believe that the agent is authorized to enter into the transaction at issue. *See Hallock v. State*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178 (N.Y. 1984); *Ford v. Unity Hospital*, 32 N.Y.2d 464, 346 N.Y.S.2d 238 (N.Y. 1973). Thus, apparent authority requires the third party to demonstrate two facts: "(1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question, and (2) the third party reasonably relied on the representations of the agent." *Herbert Constr. Co. v. Continental Ins. Co.*, 931 F.2d 989, 993-94 (2d Cir. 1991) (citations and quotations omitted); *accord FDIC v. Providence College*, 115 F.3d 136, 140 (2d Cir. 1997). The New York Court of Appeals has emphasized, as embodied in the first requirement, that an agent's conduct alone cannot be the basis for apparent authority:

> Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority.

*Hallock*, 64 N.Y.2d at 231; *accord Fennell v. TLB Kent Co.*, 865 F.2d 498, 503 (2d Cir. 1989). The "existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Graffman v. Delecea*, No. 96-CV-7270 (SWK), 1997 WL 620833, at

*4 (S.D.N.Y. Oct. 8, 1997); *see also Herbert Constr. Co.*, 931 F.2d at 994 ("The existence of apparent authority is a question of fact.") (citations and quotations omitted).

Here, Dr. Zhao claims that, although she signed an "at will" employment agreement with the Research Foundation and it administered her salary and benefits, the Foundation cloaked Dr. Batuman with apparent authority to modify the terms of employment by delegating to her all other aspects of the employment relationship. In support of this position, Dr. Zhao points to evidence that Dr. Batuman placed the advertisement for Dr. Zhao's employment, designated the funding source for her salary, applied for and obtained the funds which paid her salary, interviewed her, hired her, and supervised her. (Defs.' Ex. 3 at 26-30, 58-60; Zhao Decl. ¶ 16.) Moreover, there is evidence that the Research Foundation allowed the employment forms containing the "at will" employment language, which was contrary to Dr. Batuman's oral and written representations of employment for at least two years, to be administered through Dr. Batuman. Specifically, Dr. Batuman sent an email to Dr. Zhao on November 29, 2001, after offering her the position, stating:

> In order for you to start here I have to fill a form that you will have to take to the research office. Please tell me when you will be available and I will have the forms ready for you. The research office will give you the date to start. Anytime in December is good for me.

(Pl.'s Ex. F.) In addition, Dr. Batuman approved Zhao's Employee Assignment Form as the "Project Director/Co-Project Director." (Defs.' Ex. 15.)

Under these circumstances, the Court concludes that summary judgment on the issue of apparent authority is unwarranted. There are clearly material issues of disputed fact relating to whether the Research Foundation created an appearance that Dr. Batuman had apparent authority to make decisions regarding and/or modify the terms and conditions of employment, and whether Dr. Zhao's reliance on any such appearance was reasonable.

## G. INDIVIDUAL LIABILITY OF DR. BATUMAN

Dr. Batuman argues that both the Title VII claims and breach of contract claim against her, as an individual, must be dismissed as a matter of law. With respect to the Title VII claims, Dr. Batuman argues that the claims must be dismissed because Title VII does not provide a cause of action against individual defendants. With respect to the breach of contract claim, Dr. Batuman argues that the claims against her in her official capacity as a state employee are barred by the Eleventh Amendment. For the reasons that follow, the Court finds that summary judgment in favor of Dr. Batuman is appropriate on both the Title VII and breach of contract claims.

It is axiomatic that Title VII does not provide a cause of action against individual defendants. *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1994), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *accord Cook*, 69 F.3d at 1241 n.2. There is no question that Dr. Zhao's attempt to sue Dr. Batuman under Title VII is contrary to this well-established law. Accordingly, Dr. Batuman's motion for summary judgment on

the Title VII claims is granted.[7]

As to the breach of contract claim, there is no question that SUNY is a state agency entitled to Eleventh Amendment immunity. *See Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir. 1990) ("For Eleventh Amendment purposes, SUNY is an integral part of the government of the State [of New York] and when it is sued the State is the real party.") (quotation omitted) (alteration in original). Moreover, a claim against a state official acting in an official capacity is a claim against the state that is likewise barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984); *see also Garcia v. S.U.N.Y. Health Sciences Ctr.*, 280 F.3d 98, 107 (2d Cir. 2001) ("Insofar as [plaintiff] is suing the individual defendants [who are SUNY administrators and professors] in their official capacities, he

---

[7] However, under New York State Human Rights Law an individual may be liable where that individual "actually participates in the conduct giving rise to a discrimination claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *see also Briggs v. Mercedes-Benz Manhattan, Inc.*, No. 04-CV-7094 (RMB), 2006 U.S. Dist. LEXIS 70489, at *31 (S.D.N.Y. Sept. 27, 2006). Here, as described *supra*, Dr. Zhao has created sufficient issues of fact with respect to whether Dr. Batuman "actually participated" in any alleged discrimination. *See e.g., Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) ("[Plaintiff] has presented sufficient evidence to create a triable question as to whether each of the named individual defendants "actually participate[d]" in the conduct giving rise to [plaintiff]s claim of unlawful discrimination in violation of the NYSHRL.").

is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent that it shields SUNY."). Therefore, as a SUNY official, any breach of contract claims against Dr. Batuman are barred by the Eleventh Amendment.

Dr. Zhao seeks to avoid application of the Eleventh Amendment by arguing that there is a triable issue of fact as to whether Dr. Batuman is a "state actor" for purposes of the Eleventh Amendment. In particular, Dr. Zhao claims that "there is an issue of fact as to whether Dr. Batuman, although ostensibly an employee of SUNY, was, for the purposes of running her laboratory, acting as an agent/employee of the Research Foundation, a private entity." (Pl.'s Opp. Br., at 5.) The Court finds this argument to be without merit. It is undisputed that any actions by Dr. Batuman with respect to the alleged contract were performed by Dr. Batuman in her official capacity as SUNY's employee and representative. (Defs.' 56.1 Stmt ¶ 93.) Although Dr. Zhao concedes that Dr. Batuman was acting "as representative of SUNY," she argues that Dr. Batuman was also operating as an agent of the Research Foundation. (Zhao 56.1 Stmt. ¶ 93.) However, even assuming that to be true, Dr. Batuman is still entitled to Eleventh Amendment immunity because there is no question that any actions that she took as an agent of the Research Foundation also were performed as part of her official capacity as a SUNY employee.

III. CONCLUSION

For the reasons set forth above, defendants SUNY and the Research Foundation's motions for summary judgment are DENIED. Dr. Batuman's motion for summary judgment as to the Title VII claims and breach of contract claims is GRANTED, and as to the NYSHRL claim is DENIED.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: January 8, 2007
Central Islip, New York

* * *

Attorney for plaintiff is Susan C. Warnock, Esq., of Hockert, Warnock & Donnelly, 880 Third Avenue, New York, New York 10022. Attorneys for State University of New York and Dr. Batuman are Eliot Spitzer, Attorney General of the State of New York and David B. Diamond, Esq., Assistant Attorney General, 120 Broadway, New York, New York 10271. Attorneys for Research Foundation of State University of New York are Cathleen Ann Giannetta, Esq., Michael J. D'Angelo, Esq., and Rebecca R. Embry, Esq. of Landman Corsi Ballaine & Ford PC, 120 Broadway, New York, New York 10271.